Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1790 | **DATE** | 4/24/2002 |
| **CASE TITLE** | | Threlkeld vs. White Castle, et al. | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The officers' motion for summary judgment (110-1) is granted in part and denied in part. The Hospital's motion for summary judgment (114-1) is denied. Dr. Bello's motion for summary judgment (116-1) is granted in part and denied in part. Pretrial conference set for 5/24/02 at 3:00 p.m. at which time trial will be set. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 7 | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | APR 2 5 2002 | |
| | Notified counsel by telephone. | | | date docketed | 156 |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | 4/24/2002 | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| MPJ | courtroom deputy's initials | U.S. DISTRICT COURT 02 APR 24 PM 3:37 Date/time received in central Clerk's Office | | MPJ mailing deputy initials | |

DEBORAH A. THRELKELD,  )
                       )
        Plaintiff,     )
                       )
    v.                 )       No. 99 C 1790
                       )
WHITE CASTLE SYSTEMS, INC., an  )
Illinois corporation, ANDRE    )
TILLMAN, SILK WILLIAMS, RAMONA )
WILSON, ALPHONSO BELLO, M.D.,  )
and JACKSON PARK HOSPITAL,      )
                       )
        Defendants.    )

**DOCKETED**
**APR 25 2002**

## MEMORANDUM OPINION AND ORDER

Deborah Threlkeld was arrested and taken to the hospital, where she was restrained and injected with a sedative against her will on June 13, 1998. She sues Chicago Police Officers Silk Williams and Ramona Wilson ("the Officers") for excessive force and unlawful detention under 42 U.S.C. § 1983,[1] and brings various state law claims against White Castle Systems, Inc., Andre Tillman, Dr. Alphonso Bello, and Jackson Park Hospital ("the Hospital"). Defendants Williams, Wilson, Bello and Jackson Park Hospital move for summary judgment.

### I. Background

Ms. Threlkeld and her children went to the White Castle restaurant at 1550 East 79th Street in Chicago, Illinois, in the

---

[1] She has abandoned her false arrest claim against Officers Williams and Wilson.

156

evening on June 13, 1998. While parking her car, she became entangled in a fight with Andre Tillman, a security guard for White Castle. Officer Williams and Wilson responded to a police dispatch and arrived at the White Castle after Mr. Tillman had already handcuffed Ms. Threlkeld. When the Officers arrived, Ms. Threlkeld was crying and saying "Hallelujah" repeatedly in a high pitched voice. The Officers walked over to Mr. Tillman and Ms. Threlkeld, and the Officers were told that Ms. Threlkeld had assaulted an officer. Mr. Tillman signed a misdemeanor criminal complaint for simple battery, and the Officers offered to take custody of Ms. Threlkeld. The Officers told her to kneel down so that they could take off the handcuffs put on by Mr. Tillman and replace them with their handcuffs. The Officers say that she did not physically resist, but Myonie Payton, Ms. Threlkeld's daughter, said that it looked like Ms. Threlkeld did not go down to her knees "by her own actions" and that it looked like someone had pulled or yanked her down. Ms. Threlkeld does not claim any injuries as a result of being forced to her knees.

Ms. Threlkeld testified that the handcuffs were so tight that they cut into her skin, leaving a mark that was still on her wrist at the time of her deposition, nearly two years later. She said she could not remember whether it was the first or second set of handcuffs that cut into her skin, but that the handcuffs were tight all the way until the nurse at the Hospital asked the Officers to

take them off. She said that she asked the Officers to loosen the handcuffs and they did not respond. One doctor told Ms. Threlkeld that she might have nerve damage as a result of the tight handcuffs.

The Officers took Ms. Threlkeld to the Fourth District Chicago Police station. On the way to the station, Ms. Threlkeld continued to scream and shout. She was taken to an interview room, and she admits that she was crying and praying hysterically. Lieutenant Kenneth Januszyk, the watch commander on duty at the Fourth District, heard screaming coming from an adjacent interview room, and after ten minutes he went to the interview room and asked Officer Williams what was going on and how long Ms. Threlkeld had been screaming. Lt. Januszyk decided that Ms. Threlkeld was acting peculiarly and was too unstable to be charged, so he ordered the Officers to take her to Jackson Park Hospital for a psychiatric evaluation.

The Officers testified that Ms. Threlkeld continued to scream and rock on the way to the Hospital, but Ms. Threlkeld said that she was quiet and was trying to be cooperative. Ms. Threlkeld says that the Officers told Hospital personnel that she was in need of psychiatric evaluation, but that they did not explain the ordeal that Ms. Threlkeld had gone though. She says that the Officers' statements were false, but she offers no evidence in support of that claim except her own belief that she was not a threat to

3

herself or others. Pl's Resp. to Defs.'s Stmt. of Facts ¶30. A
nurse came in to take her vital signs, and Ms. Threlkeld told the
nurse that she had insurance and would rather see her own physician
at Rush Presbyterian Hospital, and the nurse told the Officers that
she was refusing care. At some point, the Officers signed an
Involuntary Admission form for Ms. Threlkeld. A man in a uniform
told Ms. Threlkeld to follow him, and he led her to an observation
room on the psychiatric side of the emergency room with two beds--
one with restraints and one without. Ms. Threlkeld moved toward the
bed without restraints, but someone asked her to go to the bed with
restraints. When Ms. Threlkeld began to question this, the Officers
and Jackson Park employees physically took her to the bed with
restraints and strapped her to the bed. Ms. Threlkeld said that she
was quiet and cooperative until the Officers and Hospital employees
started to try and restrain her. After this, Ms. Threlkeld received
a shot of Ativan, a tranquilizer.

During Ms. Threlkeld's stay at the Hospital, she was seen
twice by Dr. Bello. He testified that he never saw her in
restraints and never ordered restraints to be placed on her. The
first time Dr. Bello saw her, he said she was sitting on the bed,
sobbing uncontrollably, rocking back and forth and occasionally
saying "Hallelujah." Dr. Bello's opinion was that she was having an
hysterical reaction. Ms. Threlkeld describes her behavior more
mildly; she says she was merely upset and crying, and was not

yelling, uncooperative or hysterical. Dr. Bello testified that he introduced himself to her and tried to talk to her, but that she would not talk, so he ordered a shot of Ativan to calm her down so that he could evaluate her, and then he left the observation room. He admits that he never told Ms. Threlkeld that he had ordered the shot and never asked for her consent. He also admits that he never believed that Ms. Threlkeld presented a risk of harm to herself or others.

Ms. Threlkeld says that when the nurse told her that she was going to get an injection to calm her nerves down, she refused the injection. Actually, she testified that she told the nurse that "this wasn't anything a cup of hot tea couldn't handle, and a nice warm bath." Construed in the light most favorable to Ms. Threlkeld, this comment could be construed as refusal of the medication. After the shot of Ativan was administered, Dr. Bello returned to the observation room, and Ms. Threlkeld was quiet, coherent, calmed down and cooperative. She told Dr. Bello what had happened to her at the White Castle, and Dr. Bello determined that she was not mentally ill or in need of psychiatric treatment. He conducted a physical examination and then released her into the custody of her mother and daughter.

Ms. Threlkeld brought this suit against the Officers, Dr. Bello and the Hospital, all of whom move for summary judgment. Summary judgment is proper when the record "show[s] that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001).

## II. Defendants Williams and Wilson

Ms. Threlkeld's claim for excessive force against the Officers is tripartite: she claims that the Officers used excessive force in pushing her to her knees to exchange handcuffs, in making her handcuffs too tight, and in restraining her to the bed at the Hospital. Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard. *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 475 (7th Cir. 1997). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). There is no constitutional violation where "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

6

motivation." *Lanigan*, 110 F.3d at 475 (citing *Graham*, 490 U.S. at 397). The relevant facts and circumstances are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "While excessive force does not require injury, no injury gives weight to the assertion of no excessive force." *Meyer v. Robinson*, 992 F.2d 734, 739 (7th Cir. 1993) (citation omitted).

Even viewed in the light most favorable to Ms. Threlkeld, the force used to push her to her knees and to place her in restraints at the Hospital was not excessive. Although there is no indication that Ms. Threlkeld resisted the order to go to her knees, she was accused of battery of Mr. Tillman, who was present. Although the battery alleged was not particularly severe--Mr. Tillman did not appear to be injured--a reasonable officer could have believed that there was some danger of violence. *Cf. Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (holding that arrest for traffic violation did not indicate any tendency toward violence and weighed against finding that force used was reasonable). The force used to push Ms. Threlkeld to her knees did not knock her over, and she did not suffer any injuries. In light of the relatively minor force alleged and the absence of an injury, as well as the fact that Ms. Threlkeld was accused of hitting an officer, I conclude that the force used was reasonable in light of the undisputed facts and

circumstances. As for the claims arising out of the use of restraints at the Hospital, Ms. Threlkeld admitted that she resisted when she was carried from one bed to the bed with the restraints, and the only allegations of force are that the Officers helped lift her up and place her down, and that both the Officers and the Hospital personnel were "grabbing" her. Pl.'s Dep. at 189. She does not claim that she was injured in the course of being moved and restrained. In light of her admitted resistance, the minimal amount of force used was not excessive.

Nevertheless, Ms. Threlkeld presents enough evidence to survive summary judgment on the claim arising out of the tight handcuffs, which cut into her skin and left a mark nearly two years later. Ms. Threlkeld still has pain in her wrists, which one doctor told her might have been caused by tight handcuffs. There is no evidence that she resisted when she was handcuffed by the Officers. Although she testified that she could not remember whether it was the first set of handcuffs, placed by Mr. Tillman, or the second set, placed by the Officers, that cut into her skin, she explained that the handcuffs were tight until the nurse at Jackson Park Hospital told the Officers to remove them. She complained to the Officers, and the Officers did nothing--they did not even check how tight the cuffs were on Ms. Threlkeld's wrists. The Officers argue that tight handcuffing cannot rise to the level of excessive force, but the cases it cites are distinguishable. In *Jones v. Village of*

*Villa Park*, 815 F. Supp. 249 (N.D. Ill. 1993) (Aspen, J.), the defendant fled from the handcuffing officer, resisted arrest when he was caught, defied an order to place his hand on the rear of the police car during the arrest, and was not injured. *Id.* at 251, 254. None of those circumstances is present in this case. In *Wolinksy v. City of Chicago*, No. 99 C 2995, 2000 WL 631292 (N.D. Ill. May 12, 2000) (Hibbler, J.), the court dismissed a claim for tight handcuffing for failure to state a claim, but there was no allegation of an injury. *Id.* at *2. Although the Seventh Circuit has not specifically addressed the viability of an excessive force claim for tight handcuffing, other circuit courts have recognized such a claim. *See Kostrzewa*, 247 F.3d at 639-40 (holding that plaintiff stated claim for tight handcuffing where he complained to officers that handcuffs were tight and in response officers drove recklessly, tossing the plaintiff around in his handcuffs and causing minor injuries to wrists); *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (denying summary judgment where the officers refused to loosen handcuffs after plaintiff complained). A reasonable jury could conclude here that the Officers placed the handcuffs tighter than was reasonably necessary under the circumstances, and that their indifference to Ms. Threlkeld's complaints led to long-term injuries to her wrists.

The Officers argue that, even if Ms. Threlkeld can make out a claim for excessive force, they are entitled to qualified immunity.

*See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (holding that threshold question for qualified immunity is whether plaintiff can make out a claim for a violation of a constitutional right). The Officers are entitled to qualified immunity if a reasonable officer could have believed that his conduct was constitutional in light of the clearly established law and the information that the officer possessed at the time of the incident. *See Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999). It is Ms. Threlkeld's burden to show that the right not to be handcuffed so tight that it causes lasting injury was clearly established at the time of her arrest, and she may do so by

> (1) pointing to a closely analogous case that established the right to be free from the type of force the police officers used on [her], or (2) showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.

*Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Ms. Threlkeld points to no closely analogous case, but I must use my full knowledge of relevant precedents. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). My own research uncovered no cases from this circuit or the Supreme Court that are on all fours with the facts of Ms. Threlkeld's claim, and the cases from the Ninth and Sixth Circuits involved more egregious conduct by the police officers than is evident from the record here. The question is thus whether the Officers should have known, objectively, that they were putting the handcuffs on Ms. Threlkeld so tightly that they would cut into her

skin and cause permanent damage; if so, this would be the kind of "wholly gratuitous" injury that would be an "'elementary violation' of the Fourth Amendment." *Clash*, 77 F.3d at 1047. However, too little is known, on this record, about the type of training that the Officers receive in handcuffing, and about the specific circumstances of the handcuffing, to conclude that the Officers' behavior was reasonable as a matter of law in light of the minimal degree of harm and risk of flight presented by Ms. Threlkeld at the time. *See id.* Where "[k]ey facts [and circumstances] are unknown and disputed," denial of summary judgment on the question of qualified immunity is proper. *Id.*

Ms. Threlkeld's claim for improper detention is based on the Officers' misrepresentation to the personnel at the Hospital that she was in need of psychiatric or psychological treatment and on the Officers' assistance in restraining her. To the extent that her claim is based on the Officers' participation in restraining her, I have already held that she fails to state a claim for excessive force. A claim for involuntary admission has two constitutional dimensions: the Fourth Amendment governs whether there was probable cause to believe that she was in need of involuntary commitment, and the Fourteenth Amendment governs the procedural protections provided by Illinois law to Ms. Threlkeld during and after her involuntary admission. *See Baltz v. Shelley*, 661 F. Supp. 169, 179 n.37 (N.D. Ill. 1987) (Williams, J.). Ms. Threlkeld does not argue

11

that the procedures afforded were deficient, and she does not offer any evidence from which a jury could so conclude, so I confine myself to the question of whether there was probable cause to commit Ms. Threlkeld involuntarily.

"[P]robable cause to hospitalize a person against that person's will exists where the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant an individual of reasonable caution in the belief that an immediate danger exists of the person hurting herself or others." *Baltz*, 661 F. Supp. at 179. Where a plaintiff is arrested and taken to the police station before being admitted to the hospital, the reasonableness of commitment "depends on the behavior [s]he exhibited at the police station to which [s]he was taken immediately after [her] arrest." *McKinney v. George*, 726 F.2d 1183, 1188 (7th Cir. 1984). Ms. Threlkeld does not dispute that the Officers had probable cause to arrest her on a charge of battery, a crime of violence. On her own version of the facts, she was hysterical when she was at the police station. Pl.'s Dep. at 107. Because the facts are undisputed, I may determine whether probable cause exists as a matter of law, *Potts v. City of Lafayette*, 121 F.3d 1106, 1112 (7th Cir. 1997), and I conclude that it does.

All that Ms. Threlkeld offers to support her claim that her commitment was illegal is that the Officers made "false statements"

to the Hospital personnel that led to her involuntary admission;
*viz.*, that she was in need of psychiatric or psychological
treatment. However, her only support for the allegation that the
Officers' statements were false is that she "disagrees that [she]
was ever a threat to herself or to others" while she was in custody
at the police station. Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 30.
Conclusory assertions unsupported by evidence in the record cannot
be used to create a genuine issue of material fact. *See Packman v.
Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001). In any
event, the probable cause inquiry "does not require that [an]
officer's belief be correct or even more likely true than false, so
long as it is reasonable." *Qian v. Kautz*, 168 F.3d 949, 953 (7th
Cir. 1999). If the Officers actually knew that they were supplying
false information, this might be relevant to a determination of
whether they were entitled to qualified immunity, *see Hammond v.
Kunard*, 148 F.3d 692, 697 (7th Cir. 1998), but there are
insufficient facts in the record to support the allegation that the
Officers' statements were "false," and the undisputed evidence
establishes that they reasonably believed that involuntary
admission was necessary. Therefore I grant summary judgment to the
Officers on the unlawful detention claim, and I grant it in part
and deny it in part as to the excessive force claims.

### III. Defendants Jackson Park Hospital and Dr. Bello

Dr. Bello and the Hospital argue that Ms. Threlkeld cannot

13

base a medical malpractice claim on violations of the Illinois Mental Health and Developmental Disabilities Code, 405 ILCS 5/1-100 *et seq.* (the "Code"), because it is not a public safety statute designed to protect people like Ms. Threlkeld from injuries like hers. Rather than making arguments based on the facts, they largely revisit questions of law that I have already decided in the Hospital's motion to dismiss. *See Threlkeld v. White Castle Sys., Inc.*, 127 F. Supp. 986, 990 (N.D. Ill. 2001). They offer me no reasons to reconsider my ruling,[2] although they make a number of new arguments that I will address. Dr. Bello and the Hospital argue that the emergency room at the Hospital is not a "mental health facility" within the meaning of the Code. Section 5/1-114 of the Code defines "mental health facility" in relevant part as "any facility, or section thereof, operated by the State or a political subdivision thereof for the treatment of persons with mental illness and includes all hospitals, clinics, evaluation facilities, and mental health centers which provide treatment for such persons." An Illinois court has held that the Code contemplated that "there may be sections within a hospital devoted to treatment

---

[2] In fact, *In the Matter of Dieter*, 370 N.E.2d 84 (Ill. App. Ct. 1977), which they cite for the proposition that the Code is not a public safety statute, reinforces my ruling rather than calling it into question. Citing *In re Stephenson*, 367 N.E.2d 1273 (Ill. 1977), the court stated that the Code "represents a serious attempt to provide beneficial treatment and care for the mentally ill with the minimum ostracism and confinement consistent with the protection of the public." 370 N.E.2d at 86.

14

of mentally ill patients. Those sections or units, and not the entire hospital, are mental health facilities for the purposes of the involuntary admission provisions of the Code." *In re Moore*, 704 N.E.2d 442, 446 (Ill. App. Ct. 1998). There the hospital had a separate psychiatric unit that was the *only* section of the hospital licensed as a mental health facility, and the court held that the emergency room of that hospital was not a "mental health facility" under the Code. *Id.* Here, however, the emergency room was divided into two sections--a medical side and a psychiatric side--and there is evidence that Ms. Threlkeld was admitted to and treated on the psychiatric side. *See* Bello Dep. at 9-11.

The Hospital also argues that Ms. Threlkeld is not within the scope of the Code because the Code defines "adequate and humane care and services" as those provided to "a recipient of services confined in an inpatient mental health facility." 405 ILCS 5/1-101.2. This provision affects Ms. Threlkeld's claim, if at all, only under section 5/2-102(a) (right to notice of effects of psychotropic medication), not under section 5/2-107(a) (right to refuse psychotropic medication), or section 5/2-108 (restraint). In any event, with respect to the claim based on section 5/2-102(a), there is evidence from which a jury could conclude that she was a

recipient of services,[3] confined[4] in a mental health facility, so the only question is whether she was treated as an "inpatient." The Code does not define "inpatient," nor am I aware of cases construing that term. The plain meaning of "inpatient" is "a patient admitted to a hospital." *Webster's II New Riverside University Dictionary* 631 (1994). The Hospital offers no evidence or argument on this point, except to say that Ms. Threlkeld was only admitted for a brief period of time, and Ms. Threlkeld comes forward with evidence to support a finding that she was admitted. She may base her malpractice claim on the Code.

Under Illinois law, in medical malpractice actions, "[e]xpert testimony is necessary to establish both (1) the standard of care expected of the professional and (2) the professional's deviation from the standard." *Jones v. Chicago HMO Ltd. of Ill.*, 730 N.E.2d 1119, 1130 (Ill. 2000). Dr. Bello argues that Ms. Threlkeld has not provided any expert testimony about the standard of care or his deviations from it, but expert testimony is not necessary where lay persons can readily recognize or infer negligence. *Walski v.*

---

[3] "Recipient of services" is defined as a person who receives treatment or habilitation, 405 ILCS 5/1-123, and "treatment" is defined to include "pharmaceuticals," 405 ILCS 5/1-128.

[4] The Officers state that they "completed an Involuntary Admission form for plaintiff's admission for psychiatric evaluation," Officers' Stmt. of Facts ¶ 33, and Ms. Threlkeld says that she was retrained. Neither the Hospital nor Dr. Bello offers evidence on this matter, so a jury could reasonably conclude that Ms. Threlkeld was "confined" by the plain meaning of the term.

*Tiesenga*, 381 N.E.2d 279, 282 (Ill. 1978). Here the Code sets the standard of care, and Dr. Bello's own testimony demonstrates deviance from that standard. Dr. Bello argues that, under Illinois' "school of medicine" doctrine, the Code cannot set the standard for him because he is a family practitioner and not a psychiatrist. *See Dolan v. Galluzzo*, 396 N.E.2d 13, 16 (Ill. 1979) (An expert who testifies about the standard of care for a physician in a medical malpractice action must be licensed in that particular school.). The Code does not speak of psychiatrists, however; it applies to any physician who provides mental health services, and there is sufficient evidence from which a jury could conclude that Dr. Bello fit that definition. *See* 405 ILCS 5/2-102(a) (referring to "physician" who administers psychotropic medications); 405 ILCS 5/1-120 (defining "physician" as any person licensed by the state of Illinois to practice medicine in all its branches"). *Cf.* 405 ILCS 5/1-121 (defining "psychiatrist"). However, to the extent that physician testimony is required, "the testimony of the defendant doctor may be sufficient to establish the standard of care." *Walski*, 381 N.E.2d at 284.

Dr. Bello argues that, even if the Code applies to Ms. Threlkeld's claims, there is no evidence to establish his liability. Section 5/2-108 of the Code states that restraints may only be used when necessary to prevent the patient from harming herself or others. Dr. Bello testified that he never saw Ms.

17

Threlkeld in restraints, but she testifies that she was restrained. However, there is no evidence form which a jury could reasonably conclude that Dr. Bello himself ordered the restraints. Ms. Threlkeld argues that there is a question of fact here, because Dr. Bello testified that he did not remember whether he ordered restraints. However, Dr. Bello was asked twice at his deposition if he ordered restraints for Ms. Threlkeld; both times he answered "no." Bello Dep. at 19, 32. When asked whether he ordered restraints for *any* patient that night, he testified that he could not remember. *Id.* Whether he remembers ordering restraints for any other patient has no bearing on his unequivocal testimony that he did not order restraints for Ms. Threlkeld. She may not create a question of fact by taking testimony out of context, *Taylor v. Monsanto Co.*, 150 F.3d 806, 810 (7th Cir. 1998), so Dr. Bello is entitled to judgment as a matter of law on the unlawful restraint claim. However, the Hospital does not argue that it is entitled to judgment on this claim, and there is evidence from which a reasonable jury could conclude that a Hospital employee restrained Ms. Threlkeld in violation of section 5/2-108, so that claim stands.

A reasonable jury could also conclude on this record that Dr. Bello ordered the administration of Ativan, a psychotropic drug, without advising Ms. Threlkeld of the side effects and without honoring her refusal in violation of sections 5/2-102 and -107(a)

of the Code. Dr. Bello argues that it is undisputed that the Ativan was needed, but by Ms. Threlkeld's testimony she was calm except for when she was being restrained. He also argues that the Ativan helped her and did not harm her, but Ms. Threlkeld testified that she has suffered emotional distress as a result of her experience at the Hospital. I cannot conclude as a matter of law that she could not persuade a jury.

### III. Conclusion

I GRANT summary judgment to the Officers on the unlawful detention claim, and I GRANT it in part and DENY it in part as to the excessive force claims. I Deny the Hospital's motion for summary judgment. I GRANT Dr. Bello's motion in part with respect to the claim for unlawful detention, but otherwise it is DENIED.

**ENTER ORDER:**

*Elaine E. Bucklo*
_____
**Elaine E. Bucklo**
United States District Judge

Dated:    April 24, 2002